CUDAHY (MICHAEL F.), Respondent, vs. TAX COMMISSION
and others, Appellants.

*November 11—December 7, 1937.*

318

For the appellants there were briefs by the *Attorney General, Harold H. Persons,* assistant attorney general, *C. Stanley Perry,* assistant corporation counsel of Milwaukee county, attorneys, and *T. Carroll Sizer* of Madison of counsel, and oral argument by the *Attorney General, Mr. Persons, Mr. Sizer,* and *Mr. John S. Best* of Madison.

For the respondent there were briefs by *Miller, Mack & Fairchild,* and oral argument by *Frederic Sammond* and *Herbert C. Hirschboeck,* all of Milwaukee. .

ROSENBERRY, C. J. The consideration of the validity of the additional assessment involves two distinct and separable questions: First, Was the Wisconsin Tax Commission without statutory power on May 23, 1936, to impose an additional assessment upon Michael F. Cudahy, hereinafter called the "taxpayer"? Second, Did the transactions involved claimed by the taxpayer to be a reorganization result in taxable income to the taxpayer in 1929? Each of these matters will be treated separately.

## Part I.

The income dealt with was the income for the year 1929. Sec. 71.11 (5), of the statutes of 1929, provided:

"Additional assessments and corrections of assessments may be made of income of any taxpayer if such corrections are made within seven years after the close of the period covered by the income tax return, provided that after July 1, 1929, additional assessments or corrections and assessments may be made if such assessments and corrections are made within four years after the close of the period covered by the income tax return. . . ."

In *Weyenberg Shoe Mfg. Co. v. Kelley* (1933), 210 Wis. 638, 246 N. W. 418, 247 N. W. 320, the court had the interpretation of this statute under consideration. It was there held that the Wisconsin Tax Commission was without power and authority to make an additional assessment under this section unless it was made, completed, and entered on the tax roll within the four-year period. In this case the four-year period ended December 31, 1933. The tax having been imposed on May 23, 1936, the taxpayer contends that the Tax Commission was without authority to impose it.

Prior to January 15, 1932, the assessor of incomes had audited the taxpayer's income for the years 1925 to 1930, inclusive, which audit showed an additional income tax liability of $161,643.64 for the year 1929, and on that day the assessor of incomes notified the taxpayer that he would levy an additional assessment which would be computed in the amounts stated on the exhibit schedules annexed to the auditor's report. Within the twenty days specified by sec. 71.12 of the statutes and on February 4, 1932, the taxpayer served and filed his objections to the proposed assessment and requested a hearing thereon before the income tax board of review. On November 27, 1933, there was a hearing before the board of review, testimony was taken, and a full

disclosure made by the taxpayer, and counsel on both sides argued the case. It was agreed that briefs should be filed with the board by December 6th, and reply briefs by December 10th. Although briefs were filed, additional evidence was heard and received on May 21, 1934, and on June 8, 1934, the board of review made its decision holding that the transactions did not result in a taxable income. From this determination an appeal was taken to the Tax Commission by the assessor of incomes.

In the meantime the legislature had enacted ch. 348, Laws of 1933, which became effective June 30, 1933. This act added a new section to the statutes to read:

"71.115  *Years open to audit and adjustment.* . . .

"(4) All additional assessments of back income taxes shall be deemed to have been made within the limitation period provided by section 71.11 (5) of the statutes for 1927, 1929 and 1931, if notice thereof pursuant to section 71.12 was given to the taxpayer while the years the income of which is included in such assessments were open to adjustment and correction under section 71.11 (5) of said statutes."

It is contended on behalf of the Tax Commission that this statute operated retroactively, and that the notice given January 15, 1932, amounted to an additional assessment. The trial court held that the section did not operate retroactively; that in accordance with the provisions of sec. 370.06, Stats., which provides:

"In any case when a limitation or period of time prescribed in any act which shall be repealed for the acquiring of any right, or barring of any remedy, or for any other purpose shall have begun to run before such repeal and the repealing act shall provide any limitation or period of time for such purpose, such latter limitation or period shall apply only to such rights or remedies as shall accrue subsequently to the time when the repealing act shall take effect, and the act

repealed shall be held to continue in force and be operative to determine all such limitations and periods of time which shall have previously begun to run unless such repealing act shall otherwise expressly provide."

the act operated prospectively.

Accordingly, the trial court held that the additional assessment could not be "deemed to have been made" prior to December 31, 1933.

We do not find it necessary to determine whether or not the statute operated retroactively or whether ch. 1, Laws of Sp. Sess. 1937, is applicable to the case, or if it is, whether it is valid.

It appears without dispute that on November 21, 1933, the taxpayer received a letter or a copy of a letter written by L. E. Cochran, one of the auditors in the office of the assessor of incomes, the material part of which is as follows:

"Notice of a proposed assessment was made under date of January 15, 1932, and taxpayer asked for a hearing before the board of review in respect to 'Capital Gain arising from the disposition of common stock of Northern Refrigerator Car Company.'

"The said audit report reviews the receipt by taxpayer of 34,612 shares of the preferred stock of Northern Refrigerator Line, Inc., against which is applied his cost of 23,650 shares of the common stock of the Northern Refrigerator Car Company which he surrendered. This transaction was in accordance with a plan of reorganization dated January 3, 1929.

"It has now come to our notice that a second plan of reorganization was entered into dated January 8, 1929, wherein taxpayer parted with 440 shares of the common stock of Northern Refrigerator Car Company in exchange for which he received 643 shares of the preferred stock of Northern Refrigerator Line, Inc., in the final and complete liquidation of the Northern Refrigerator Car Company."

(The letter then states the amount of taxable gain claimed to be derived from the transaction.)

On the same day counsel for the taxpayer addressed a letter to Mr. John H. Leenhouts, assessor of incomes, as follows:

"We have a letter dated November 21st signed by Mr. Cochran, your auditor, inclosing a letter, dated November 21st in each of the above cases [Re: Michael F. Cudahy and John Cudahy], which sets out a further alleged profit on exchange of stock in each case. It is understood that at the hearings you are going to present these letters to the board as the basis for an additional proposed assessment in each case. The facts are correctly stated in the letters."

(Letter then recites counsel's contention as to how the matter should be disposed of.)

In the statement of facts contained in the taxpayer's petition for review the facts in regard to the writing and receipt of the letters of November 21, 1933, are recited. It is further alleged that on November 27, 1933, at the first hearing before the income tax board of review, appellant (taxpayer here) waived notice of proposed additional assessment of $34,341 and submitted to trial of the issues involved therein before the board of review. The statement continues:

"Appellant made full disclosure under oath at the hearing before the board of review held on November 27, 1933."

The Cochran letter and the reply of taxpayer's counsel thereto indicate that the transaction was in the nature of a stipulation. The letters were apparently written and received on the same day.

These facts present the following question: Did not the taxpayer, subsequent to the enactment of ch. 348, Laws of 1933, have the equivalent of a notice of an additional assessment, referred to in sec. 71.11 (5), Stats. 1929? It must be remembered that these proceedings were not before a court, but before an administrative body, whose proceedings are informal and more or less summary. The clear intent and purpose of the provision in sec. 71.12 requiring a tax-

payer to have notice before a proposed additional assessment can be placed upon the assessment roll is to give the taxpayer an opportunity to be heard and to afford him due process of law. When the taxpayer appeared before the board of review, entered into a stipulation of the facts relating to the merits of the case, and made a full and complete disclosure, it could not thereafter be contended that he had no notice even if the notice of January 15, 1932, had never been served. A notice such as is required by sec. 71.12 does not invoke the power or jurisdiction of the Tax Commission. The Tax Commission had under the statute plenary authority. The section is a regulation of the exercise of its powers. Having had, after the enactment of ch. 348, Laws of 1933, the equivalent of full and complete notice of additional assessment within the four-year period, it is considered that sec. 71.115 operated to extend the time within which the assessment might be completed by placing the same upon the assessment roll. Ch. 348 was enacted for the purpose of changing the operation of the law as declared in the *Weyenberg Shoe Mfg. Co. Case, supra.* The difficulties which confronted the taxing authorities under the decision in that case are obvious. If the additional assessment meant, as it was held in this case it did mean, that it must be complete by the insertion of the amount of the assessment on the tax roll within the time limited by ch. 71, Stats., the hearing must have been had long enough prior to the expiration of the period to enable it to be concluded, the Tax Commission to render its decision and the amount as determined by it placed upon the tax roll. The language of the act admitted of no other construction.

It is considered under the facts of this case that the taxpayer subsequent to June 30, 1933, having had notice of a second additional assessment, and having within the four-year period on November 27, 1933, appeared before the income tax board of review and had a full hearing upon all

the issues involved in both additional assessments, may not be heard to say that he did not have the notice prescribed by ch. 348, Laws of 1933, and having such notice it operated to extend the time within which the additional assessments might be completed by placing the same upon the assessment roll. Under the 1933 statute the assessment when made was deemed to have been made as of that date and therefore within the period fixed by statute.

## Part II.

It is the contention of the Tax Commission that certain transactions to which the taxpayer was a party resulted in taxable income to him which should have been assessed as a part of his 1929 income. It is the contention of the taxpayer that the transactions did not result in a taxable income taxable in 1929, but that taxes should be deferred until such time as the taxpayer disposes of the securities received by him for the reason that he received the securities in a "reorganization" as defined by the provisions of sec. 71.02 (2) (i), Stats. 1929, which is printed in the margin.[1]

---

[1] "71.02 (2) (i)  1. No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.

"2. No gain or loss shall be recognized if a corporation a party to a reorganization exchanges property, in pursuance of the plan of reorganization, solely for stock or securities in another corporation a party to the reorganization.

"3. No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock in such corporation, and immediately after the exchange such person or persons are in control of the corporation; but in case of an exchange by two or more persons this paragraph shall apply only if the amount of the stock received by each is substantially in proportion to his interest in the property prior to the exchange.

"4. If there is distributed, in pursuance of a plan of reorganization, to a stockholder in a corporation a party to the reorganization, stock or securities in such corporation or in another corporation a party to the reorganization, without the surrender by such shareholder of stock or securities in such a corporation, no gain to the

Par. (i) was enacted by ch. 539, Laws of 1927, and made certain provisions of the revenue acts as enacted by congress in 1918 and 1921, of which it is substantially a copy, a part of the income tax law of Wisconsin. Therefore the decisions of the federal courts construing the language of these sections while not controlling are very persuasive.

In *United States v. Hendler* (1937), 91 Fed. (2d) 680, 682, the circuit court of appeals for the Fourth circuit said:

"The sections of the act in question must be construed in view of the purposes which they were intended to effect. It is well known that the purpose was to provide for the exemption from taxation at the time of a business reorganization of the gains involved therein to the extent specified in the statute in order to remove impediments to corporate readjustments and also to prevent the recognition of fictitious

distributee from the receipt of such stock or securities shall be recognized.

"5. The distribution, in pursuance of a plan of reorganization, by a corporation a party to the reorganization, of its stock or securities, or stock or securities in a corporation a party to the reorganization, shall not be considered a distribution of earnings or profits for the purpose of determining the taxability of subsequent distributions by the corporation.

"6. The term 'reorganization' means (A) a merger or consolidation (including the acquisition by one corporation of at least a majority of the voting stock and at least a majority of the total number of shares of all other classes of stock of another corporation, or substantially all the properties of another corporation), or (B) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor or its stockholders or both are in control of the corporation to which the assets are transferred, or (C) a recapitalization, or change in the form of capitalization, or (D) a mere change in identity, form or place of organization, however effected.

"7. The term 'a party to a reorganization' includes a corporation resulting from a reorganization and includes both corporations in the case of an acquisition by one corporation of at least a majority of the voting stock and at least a majority of the total number of shares of all other classes of stock of another corporation.

"8. As used in this section the term 'control' means the ownership of at least eighty per cent of the voting stock and at least eighty per cent of the total number of shares of all other classes of stock of the corporation."

gains or losses. The history of the legislation and the committee reports in congress clearly manifest this legislative intention. [Citing cases.] The result is to defer the taxation of such gains until they are subsequently realized by the corporation grantor or its stockholders through the liquidation of the securities or property received."

In *C. H. Mead Coal Co. v. Commissioner of Internal Revenue* (C. C. A., 4th Cir. 1934), 72 Fed. (2d) 22, 27, the court said:

"It appears from the reports of the congressional committees that the underlying purpose of these provisions was twofold: (1) To relieve certain types of corporate reorganization from taxation which seemed to be oppressive and premature, and (2) to prevent taxpayers from taking losses on account of wash sales and other fictitious exchanges."

The facts out of which this controversy arose are as follows: The Northern Refrigerator Car Company, hereinafter called the "Car Company," was a Wisconsin corporation, its entire capital stock consisting of 42,500 shares of common stock. Prior to 1923, Michael Cudahy, hereinafter referred to as the "taxpayer," acquired 2,365 shares of Car Company stock at a cost of $236,500. In that year the taxpayer organized the Northern Securities & Investment Company, hereinafter called "Northern Company," a personal holding company organized under the laws of Delaware and licensed to do business in Wisconsin in 1928. In 1923 the taxpayer conveyed, among other securities, 2,365 shares of Car Company stock to Northern Company. Due to a stock dividend of 10 shares for 1, Northern Company held 23,650 shares of Car Company stock in 1929. Some time prior to 1928 the taxpayer acquired another block of stock in Car Company amounting to 440 shares at a cost of $21,600. The taxpayer did not transfer this stock to Northern Company, but held it individually. As a consequence in 1928, the taxpayer personally owned 440 shares of Car Company stock in addition

to which Northern Company, his wholly owned personal holding company, held 23,650 shares of Car Company stock. In this manner the taxpayer owned or controlled 56.68 per cent of the stock of the Car Company. In 1928, John Cudahy, a brother of the taxpayer, owned or controlled 18.11 per cent of Car Company stock. Charles O'Hara owned 2,500 shares of Car Company stock. Including O'Hara's stock 25.2 per cent of the Car Company stock was held by individuals known as minority stockholders. The stockholders of the Car Company were desirous of disposing of their interests so as to relieve themselves from the management and control of the business of the Car Company, and to that end on November 27, 1928, the taxpayer, John Cudahy, and Charles O'Hara entered into an agreement with the Merchants Dispatch, a subsidiary of the New York Central Railroad Company, which was operating a business similar to that conducted by the Car Company. The essential provisions of this agreement are stated by the Tax Commission as follows:

"(1) The Cudahy and O'Hara interests agree to organize a new corporation to be called Northern Refrigerator Line Company (hereinafter referred to as the Line Company), under the laws of Delaware. The capital structure of this corporation is to consist of both common and preferred stock.

"(2) The preferred stock of Line Company is to be no par, entitled to preferred cumulative dividends at the rate of $5 per share per annum. This preferred stock is to be retired at the expiration of twenty years from the date of its issuance, if not retired before on certain contingencies. A formula is stated in the agreement to ascertain the number of preferred shares to be issued by Line Company.

"(3) Subject to the following qualifications, the entire control of Line Company is to be in its common stock. These qualifications are: No class of stock in Line Company is to be issued having equal or superior rights to the origi-

nal preferred stock; no mortgage is to be placed on the property of Line Company without the consent of the holders of three-fourths of the preferred stock; and, control of Line Company is to pass to the preferred stockholders on default in the payment of dividends or default in the retirement of the preferred stock. The number of shares of common stock and whether it is to be par or no-par stock is subject to the specification of Dispatch Company.

"(4) The Cudahy and O'Hara interests agree to cause the reorganization, consolidation and/or merger of Car Company with Line Company, and to cause Car Company to transfer all of its assets to Line Company which latter shall assume the liabilities of Car Company.

"(5) The Cudahy and O'Hara interests agree to cause Line Company to issue and to sell all of its common stock to Dispatch Company for such sum, to be paid in cash, as Dispatch Company shall elect to pay.

"(6) Dispatch Company agrees to execute a guaranty for the benefit of the preferred stockholders of Line Company whereby dividends of $5 per share per annum will be paid on such preferred stock, whether earned by Line Company or not, and such preferred stock will be purchased by Dispatch Company at $100 per share, if not retired in accordance with the provisions therefor in articles of incorporation of Line Company.

"(7) It is mutually agreed that the parties to this agreement will exercise their best efforts to effectuate the transactions therein described, but that failure to do so will not result in liability for damages on the part of either party."

Pursuant to this agreement, the Northern Refrigerator Line, Inc., hereinafter called "Line Company," was incorporated under the laws of the state of Delaware in January, 1929. The articles of incorporation authorized an issue of 62,200 shares of no-par preferred stock and 10 shares of no-par common stock. The necessary supplemental agreements to which the several corporations were parties were entered into on January 3 and January 8, 1929. Thereupon

the parties to the agreement of November 27, 1928, proceeded with the execution of that agreement as follows:
January 16, 1929:

(1) Northern Company transferred its 23,650 shares of Car Company stock to Line Company for 34,612 shares of Line Company preferred stock and all of Line Company common stock, amounting to 10 shares. Under the articles of incorporation, the common stock issued to Line Company carried with it the control of Line Company. The Car Company stock transferred to Line Company constituted 51.89 per cent of the total assets of Northern Company. Line Company preferred stock issued to Northern Company constituted 55.64 per cent of the total authorized issue of Line Company preferred stock.

(2) The 34,612 shares of preferred stock and 10 shares of common stock in Line Company were immediately transferred by Northern Company to the taxpayer. The taxpayer, as a condition of this transfer, did not relinquish any of his stock in Northern Company. It is stipulated that on January 16, 1929, the value of Line Company preferred stock was $87 per share. On this basis the Line Company preferred stock received by taxpayer had a value of $3,011,244.

(3) Line Company received 5,490 shares of Car Company stock owned and controlled by John Cudahy in exchange for 8,034 shares of Line Company preferred stock.

As a result of these transactions, Line Company acquired 29,140 shares of Car Company stock.

January 22, 1929:

(1) Line Company issued to Car Company its remaining 19,554 unissued shares of preferred stock and acquired all of the assets of Car Company. By virtue of this transaction Car Company acquired 31.43 per cent of the total outstanding Line Company preferred stock.

(2) Aside from the Car Company stock held by Line Company by virtue of the transaction recited above, Car Company had outstanding 13,360 shares of its own capital stock. Of this amount Michael Cudahy personally held 440 shares. Immediately on receipt of the 19,554 shares of Line

Company preferred stock, Car Company distributed the Line Company stock which it had received among its stockholders other than Line Company. Car Company was then dissolved. The 440 shares of Car Company stock held by the taxpayer personally had cost him $21,600. In exchange for this stock Michael Cudahy received 643 shares of Line Company preferred stock, which by stipulation had a total value of $55,941.

(3) At a special meeting of the stockholders of Line Company, held on January 22, 1929, its articles of incorporation were amended to provide for the increase of its common stock from 10 shares to 30,000 shares no-par stock.

January 30, 1929:

(1) The taxpayer surrendered the 10 shares of common stock of Line Company which he had received from Northern Company to Line Company which thereafter held it as treasury stock. Of its newly authorized 30,000 shares of common stock the Line Company issued 5,000 shares to Dispatch Company for which the Dispatch Company paid $5,000 in cash to Line Company. These 5,000 shares constituted all of the outstanding Line Company common stock. In further consideration of the issuance of this stock to it, the Dispatch Company executed a guaranty as provided in the agreement of November 27, 1928. By the terms of this instrument the Dispatch Company guaranteed that the Line Company would pay annually 5 per cent dividends and that the preferred stock of Line Company would be retired within twenty years at the agreed price of $100 per share.

When the reorganization was completed, the Line Company was the owner of all of the assets of the Car Company. The former stockholders of the Car Company or their respective shareholders were the owners of all of the outstanding preferred stock of the Line Company. Their interest in the Line Company was proportionately the same as their interest in the Car Company. The preferred stock of the Line Company represented the total value of the assets transferred to it by the Car Company. The taxpayer, a former stockholder of Car Company, was the owner of all the out-

standing common stock of Line Company which carried with it the control of Line Company. After January 30th, the control and management of the Line Company was vested in the Dispatch Company.

It is the contention of the Tax Commission that these transactions resulted in taxable income to the taxpayer taxable in the year 1929. It is the contention of the taxpayer that the transaction was a reorganization, and that if a profit accrued to him, the determination and taxation of profit was under the provisions of sec. 71.02 (2) (i), to be deferred until such time as he realized upon his preferred stock. These contentions present the question for decision in this case. The income tax board of review of Milwaukee county held that the tax was to be deferred under the provisions of par. (i). Upon appeal to the Wisconsin Tax Commission the Tax Commission held that the transaction resulted in taxable income in the year 1929. On appeal to the circuit court, the circuit court did not deal with this aspect of the case.

The questions presented have been exhaustively briefed and argued by the parties before this court. It is not contended by the taxpayer that the transaction set forth amounted either to a "merger" or a "consolidation" as those terms are understood in the law. See *Pinellas Ice & Cold Storage Co. v. Commissioner of Internal Revenue* (C. C. A., 5th Cir. 1932), 57 Fed. (2d) 188, 190. It is there said:

"As applied to corporations, the terms 'merger' and 'consolidation' have well-known legal meanings. While the result is practically the same in either event, there is this difference. In a merger one corporation absorbs the other and remains in existence while the other is dissolved. In a consolidation a new corporation is created and the consolidating corporations are extinguished. In either event, the resulting corporation acquires all of the property, rights, and franchises of the dissolved corporations, and their stockholders become its stockholders."

See also *Union Indemnity Co. v. Smith* (1925), 187 Wis. 528, 536, 205 N. W. 492.

Coming now to a consideration of whether or not the transaction amounted to a reorganization as claimed by the taxpayer, it is to be observed that it is the duty of the court to determine whether there was a substantial compliance with the statute. Each fact must be viewed in the light of the entire plan of which it is a part. *Prairie Oil & Gas Co. v. Motter* (C. C. A., 10th Cir. 1933), 66 Fed. (2d) 309; *West Texas Refining & Development Co. v. Commissioner of Internal Revenue* (C. C. A., 10th Cir. 1933), 68 Fed. (2d) 77.

Par. (i) 6, provides: "The term 'reorganization' means (A) a merger or consolidation (including the acquisition by one corporation of at least a majority of the voting stock and at least a majority of the total number of shares of all other classes of stock of another corporation, or substantially all the properties of another corporation)."

Under the facts of this case it is clear, first, that the Northern Company acquired all of the voting stock and a majority of the shares of all other classes of stock authorized and issued by the Line Company. The Tax Commission, however, arrived at the conclusion that the acquisition of the 10 shares of voting stock in Line Company by Northern Company was essentially a sham transaction. It reached this conclusion because as it points out it was contemplated by the parties to the contract of November 27, 1928, that the control and management of Line Company should ultimately rest in Dispatch Company. As authority for its position, the Tax Commission cited *Helvering v. Gregory* (C. C. A. 1934), 69 Fed. (2d) 809, 811, and quotes therefrom as follows:

"But the underlying presumption is plain that the readjustment shall be undertaken for reasons germane to the conduct of the venture in hand, not as an ephemeral incident egregious to its prosecution."

In that case the taxpayer owned all of the shares of the United Mortgage Corporation, among whose assets were some of the shares of another company, the Monitor Securities Corporation. In 1928, it became possible to sell the Monitor shares at a large profit. Had this been done, it would have resulted in a taxable gain to the United Mortgage Company. To avoid this result, the taxpayer incorporated in Delaware a new company organized and called the Averill Corporation, to which the United Mortgage Corporation transferred all of its shares of Monitor stock under an agreement by which the Averill Corporation issued all its shares to the taxpayer. Being possessed of all of the Averill shares, the taxpayer wound up the Averill Corporation three days later and received as a liquidating dividend the Monitor shares, which she thereupon sold. The court said:

"It is not disputed that all these steps were part of one purpose to reduce taxes, and that the Averill Corporation, which was in existence for only a few days, conducted no business and was intended to conduct none, except to act as conduit for the Monitor shares in the way we have described."

In the course of the opinion it used the quoted language. The court further said:

"Any one may so arrange his affairs that his taxes shall be as low as possible; he is not bound to choose that pattern which will best pay the treasury; there is not even a patriotic duty to increase one's taxes." Citing *Bullen v. Wisconsin* (1916), 240 U. S. 625, 630, 36 Sup. Ct. 473, 60 L. Ed. 830.

Further commenting, the court said:

"The Averill Corporation had a juristic personality, whatever the purpose of its organization; the transfer passed title to the Monitor shares and the taxpayer became a shareholder in the transferee. All these steps were real, and their only defect was that they were not what the statute means by a 'reorganization,' *because the transactions were*

*no part of the conduct of the business of either or both companies; so viewed they were a sham, though all the proceedings had their usual effect."*

The facts in the instant case present no parallel to the facts in the *Gregory Case*. Here the transfer by Line Company to Northern Company of all its voting stock and a majority of all its other authorized stock amounted to an exact and literal compliance with the statute. The Line Company, the newly-organized corporation, acquired all of the assets of the Car Company; it has continued the business theretofore carried on by Car Company. Viewed in the light of the whole transaction, there is no basis upon which it may be denounced as a sham transaction. The distinction between what was done in the *Gregory Case* and what was done in this case is an outstanding one. Northern Company having acquired all of the voting stock and a majority of the total number of shares of all other classes of stock of Line Company, it was not necessary for it to comply with the other alternative, that is, that it acquire substantially all the properties of another corporation (Line Company).

The Tax Commission was of the view that there was not a compliance with clause (b) of 6, which provides that a reorganization occurs when one corporation transfers part of its assets to another corporation if immediately after such transfer the transferor or its stockholders, or both, are in control of the corporation to which the assets are transferred. The Tax Commission disregarded the fact that Northern Company, one of the stockholders of Car Company, was "immediately after the transaction" the owner and holder of the entire voting stock of Line Company and that the stockholders of Car Company were the owners of the entire authorized and outstanding preferred stock of Line Company. The conclusion that there was no compliance with clause (b) of 6 rests upon the determination that the ownership of all of the voting stock consisting of 10 shares

of Line Company was a sham transaction. Looking at the transaction as a whole, the reorganization was completed when the assets of Car Company were conveyed to Line Company and its preferred stock was distributed *pro rata* to the stockholders of Car Company and the taxpayer, one of the stockholders of the Car Company, was in full control of Line Company by reason of his ownership of 10 shares of common stock being all of the voting stock of Line Company.

While a compliance with the statute requires that the transferor or its stockholders be in control of the transferee, it does not provide or contemplate that that control shall be continuous. It has been so held by the circuit court of appeals of the Eighth circuit. In *C. T. Inv. Co. v. Commissioner of Internal Revenue* (C. C. A. 1937), 88 Fed. (2d) 582, 585, the transferee corporation was organized on May 28, 1930. It acquired the business and assets of the transferor by the acceptance of an option on May 29, 1930, the actual transfer to be made June 14, 1930. The stock of the transferee was issued directly to the stockholders of the transferor in the same proportion in which they held stock in the transferor. At a special meeting of the directors of the transferee company held on July 3d, the directors accepted a subscription for the remaining 5,100 unissued shares of the stock of the transferee, 4,900 shares having been issued to the stockholders of the transferor. The board of tax appeals in its decision said:

"It follows therefore that since the transfer of assets and exchange of stock involved herein was not made in pursuance of a plan of reorganization and the Missouri Company or its stockholders were not in control of the Delaware Company immediately after the transfer of the property involved, the determination of the respondent, that such exchange is taxable and not within the nonrecognition provisions of section 112 of the 1928 Act, must be approved."

Subscription to the capital stock of the transferee company made on July 3, 1930, was not paid until October, 1930. The court held that by reason of the fact that the stockholders of the transferor company had received the 1,900 shares of stock of the transferee, which was all of the stock then issued, that they were in control from the time of its issue until the issue of 5,100 shares in October or November, 1930. The court said:

"The transferring company or its stockholders must be immediately thereafter in control of the transferee company. This control need not be continuous."

The use of the word "immediately" must be given some effect. If it had intended that the control must be continuous the legislature would have said "immediately" and for some specified time after the reorganization. "Immediately" can have no other meaning than at the close of the reorganization the control is invested in the transferor or its stockholders. Whether the right to control is retained for two weeks or four months it is in the transferor or its stockholders "immediately" after the reorganization is complete.

Analyzing the transaction step by step, it is considered that it conformed with exactness and meticulousness with the requirements of the statute, and that the preferred stock of Line Company which the taxpayer received came to him pursuant to a plan of reorganization and that in accordance with the provisions of the statute resulted in no taxable gain to the taxpayer in 1929.

In this connection it must not be overlooked that the statute operates in many cases to prevent a taxpayer from deducting a fictitious loss, while in other cases, as in this, it may relieve him from immediate taxation on a paper profit. It should not and cannot be given one construction for one

purpose and another construction for another.  As the federal court said:

"The broad general purposes of congress, to favor business transactions including exchanges and sales of assets, to make the statutes more definite, certain, and specific, to reduce the necessity of litigation, to plan for deferments of taxes rather than exemptions, and to disallow technical losses . . . point to the construction of the statute which we have above indicated." *Minnesota Tea Co. v. Commissioner of Internal Revenue* (C. C. A., 8th Cir. 1935), 76 Fed. (2d) 797.

In that case is to be found a very thorough review of the matters which led to the enactment of the statute.  `See also *Thurber v. Commissioner of Internal Revenue* (C. C. A. 1936), 84 Fed. (2d) 815.

In a very recent case (*Groman v. Commissioner*, 302 U. S. 82, 89, 58 Sup. Ct. 108), having under consideration the meaning and scope of the phrase "a party to a reorganization," the supreme court of the United States held that a corporation organized for the purpose of effectuating a plan of reorganization was a party thereto, and that a corporation called Glidden, which caused the transferee corporation to be organized, and which subscribed and paid in cash for all of the common stock and prior preference stock of the transferee corporation, was not a party, the court said:

"It is argued, however, that Ohio [the transferee corporation] was the *alter ego* of Glidden; that in truth Glidden was the principal and Ohio its agent; that we should look at the realities of the situation, disregard the corporate entity of Ohio, and treat it as Glidden. *But to do so would be to ignore the purpose of the reorganization sections of the statute, which, as we have said, is that where, pursuant to a plan, the interest of the stockholders of a corporation continues to be definitely represented in substantial measure in a new or different one, then to the extent, but only to the extent, of that continuity of interest, the exchange is to be*

*treated as one not giving rise to present gain or loss.* If cash or 'other property,' that is, property other than stock or securities of the reorganized corporations, is received, present gain or loss must be recognized."

When the reorganization was completed in this case, as already pointed out, the former stockholders of Car Company were the owners of all of the assets of Line Company, and in the same proportions that they were owners of the assets of Car Company. It is considered that the facts in this case compel the conclusion that what the taxpayer received was pursuant to a plan of reorganization as defined by the statute.

On behalf of the Tax Commission it is argued that the transaction involved was not a reorganization because not within the provisions of sec. 71.02 (2) (i) 1:

"No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization."

The contention is that because the Dispatch Company on January 30th, executed a contract whereby it guaranteed that the annual dividend would be paid and preferred stock retired in accordance with its terms that the exchange was not solely for the securities of the transferee corporation Line Company. It is considered that this section contemplates that an exchange may be in part for stock or securities and in part for cash or property; that the preferred stock of Line Company is a security of that company hardly admits of doubt. It is no less a security of that company when the Dispatch Company two weeks after the reorganization was complete, entered into a contract whereby it guaranteed that the Line Company would pay the dividend and retire the stock within the twenty-year period. It still remained a secu-

rity of the transferee company. The preferred stock of the Line Company represented the entire value of its assets.

In *Pinellas Ice & Cold Storage Co. v. Commissioner* (1933), 287 U. S. 462, 53 Sup. Ct. 257, 77 L. Ed. 428, it was held that promissory notes of the transferee corporation, payable three months after date, were equivalent to cash and not securities within the meaning of the act.

In *Cortland Specialty Co. v. Commissioner of Internal Revenue* (C. C. A. 1932), 60 Fed. (2d) 937, 940, a similar conclusion was reached. Considering these cases the circuit court of appeals for the Seventh circuit in *Burnham v. Commissioner of Internal Revenue* (C. C. A. 1936), 86 Fed. (2d) 776, 777, said:

"The court in both cases held that the transactions there involved were sales rather than reorganizations, hence the taxpayers were not entitled to the exemption claimed. It is obvious that both courts based their decisions not so much on the ground that the short-term purchase money notes were not securities as that the transactions involved were not reorganizations."

The circuit court of appeals said in the *Cortland Case:*

"In defining 'reorganization,' section 203 of the Revenue Act gives the widest room for all kinds of changes in corporate structure, but does not abandon the primary requisite that there must be some continuity of interest on the part of the transferor corporation or its stockholders in order to secure exemption. Reorganization presupposes continuance of business under modified corporate forms. . . . The word 'securities' was used so as not to defeat the exemption in cases where the interest of the transferor was carried over to the new corporation in some form."

In the *Burnham Case* it was held that corporate promissory notes payable ten years after date were securities, and that the transaction was an exchange and not a sale. It is considered that the preferred stock issued by Line Company is a security of that company within the meaning of the act,

although the subsequent contract of guaranty was entered into by the Dispatch Company.

## PART III.

In the proceeding before the income tax board of review, the taxpayer made claim to a refund on account of a tax paid by him in 1930. The income tax board of review held that the taxpayer had been erroneously overassessed on income for 1930 and was entitled to a refund on that account. The decision of the Tax Commission upon appeal affected only the 1929 income and the assessor of incomes failed to make refund as he had been directed to do by the income tax board of review. When the taxpayer appealed to the circuit court he requested that the Tax Commission be required to certify as a part of the record all of the documents and records relating to his right to a refund. This the Tax Commission did not do. Although the matter was argued in the brief of the taxpayer here, no reference was made to it in the reply brief filed on behalf of the Tax Commission. The circuit court was of the view that the additional assessment under consideration could not be made because not made within the time limited by the statute, consequently the taxpayer would be entitled to no refund for the years under consideration, the right of the taxpayer to a refund being coextensive with the right of the taxing authorities to levy an additional assessment. *Newport Co. v. Tax Comm.* (1935) 219 Wis. 293, 261 N. W. 884. In so treating the taxpayer's claim for a refund, the circuit court was in error for the reason as this court now holds, the time within which the additional assessment might be made had not yet expired.

*By the Court.*—That part of the judgment holding the additional assessment illegal and canceling the same is hereby affirmed; that part of the judgment which in effect denied the taxpayer's claim to a refund is reversed, and the cause remanded to the circuit court with directions to determine the right of the taxpayer to the claimed refund.